INTECH, INC., Plaintiff, Appellant,

v.

CONSOLIDATED FREIGHTWAYS, INC., Defendant, Appellee.

No. 87–1070.

United States Court of Appeals, First Circuit.

Heard July 29, 1987.
Decided Dec. 30, 1987.

Norman Jackman with whom Marc A. Comras and Comras & Jackman, P.A., Boston, Mass., were on brief, for plaintiff, appellant.

Wesley S. Chused with whom Frank J. Weiner and Weiner & Chused, Boston,

Mass., were on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, TORRUELLA and NOONAN,* Circuit Judges.

TORRUELLA, Circuit Judge.

The shipper-consignee Intech, Inc., initially brought a breach of contract action in state court against the common carrier-consignor Consolidated Freightways, Inc. ("CF"). CF removed the action to federal court as one presenting a claim of interstate freight damages under the Carmack Amendment to the Interstate Commerce Act. 49 U.S.C. § 11707 (1978). Intech appeals from an order of the district court granting CF's motion for summary judgment. Fed.R.Civ.P. 56(c). The court had ruled that Intech's failure to file a written claim for damages with CF within nine months of delivery or within nine months after delivery reasonably should have been made—a condition precedent to recovery under the contract of carriage—barred this suit. We affirm the action of the district court.

## I. *Background*

Accepting the allegations in the plaintiff-appellant's affidavits as true for purposes of reviewing the propriety of summary judgment, *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), the record shows the following. In a letter dated April 23, 1985, Edward F. Barbeau, manager of the North Billerica, Massachusetts, terminal of CF quoted a price of $5,536.00 for "loading, blocking, and unloading" certain heavy machinery owned by the consignee Intech. Barbeau stated in the letter addressed to one Dowling, Intech's agent, that, "[a]s I advised you today, arrangements should be made as quickly as possible to take advantage of the special trailers that are needed" for carrying out the request. On May 7, 1985, Intech submitted to CF a purchase order for the quoted price.

On May 17, 1985, CF issued a Uniform Straight Bill of Lading to transport a saw-cutting machine and its accessories in trailers from the pickup site in Antioch, California to its final destination in Acton, Massachusetts. The bill of lading provided that the equipment was to be delivered in separate containers, one weighing 16,000 pounds and the other 9,000 pounds. The bill of lading contained a handwritten note that stated "per Mrs. Dowling with c/."

On May 24, 1985, the 16,000 pound container carrying an Anton sawcutting machine arrived, *i.e.*, was "spotted," at Intech's yard in Acton. A dispute then arose as to CF's alleged responsibility to unload the shipment. John W. Baker, Intech's president, claims that the truck driver had said that he would unload the trailer upon arrival of the second container. Intech refused to accept the spotted container until it was unloaded. It is undisputed that the 9,000 pound container was never delivered. Baker also asserts that CF "continuously assured me through numerous telephone calls, during May of 1985 and continuing through March of 1986 that it would unload or arrange for the unloading of the machinery."

According to Intech's version of the facts, the 16,000 pound container was left at its yard until November 7, 1985. At that time, CF took the container back to its North Billerica, Massachusetts, terminal where it remains to date.

On March 16, 1986, Intech visited CF's yard "to make sure defendant had the machinery," at which time Intech discovered the damage. A report issued to Intech by the machine's manufacturer states that the shipment was improperly prepared, and that damage resulted "from a very incorrect transportation." On June 16, 1986, *about thirteen months after the container had been spotted* at its final destination, Intech presented to CF a written claim for damages. As far as the record shows, no written claim was ever filed regarding the 9,000 pound undelivered container. Nor is there any evidence of damage to it. The

---

* Of the Ninth Circuit, sitting by designation.

thrust of the complaint is that CF breached its contractual obligation to deliver the shipment in good condition, and its purported obligation to unload it. Intech requested $143,500.00 for damages to the machine.

Intech raises the following issues on appeal. First, whether Intech's written claim for damages was untimely filed, thus barring recovery for damages under the Carmack Amendment. The answer to this question depends on the meaning under the bill of lading of the term "delivery," or in case of failure to deliver, on a determination of when "a reasonable time for delivery has elapsed." Second, whether CF's actual knowledge of the damages or its conduct in preventing Intech from filing a timely claim excused Intech from complying with the provision in the bill of lading. Third, whether the Carmack Amendment preempts a colorable breach of contract claim under state law. We will consider these issues *seriatim*.

II. *Discussion*

Section 2(b) of the Uniform Straight Bill of Lading provides:

> As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading or carrier on whose line the loss, damage, injury or delay occurred, or carrier in possession of the property where the loss, damage, injury or delay occurred *within nine months after delivery of the property ... or in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed ....* Where claims are not filed ... in accordance with the foregoing provisions, no carrier hereunder shall be liable and such claims will not be paid.

(Emphasis supplied).[1]

■ The liability of a carrier for damages to goods shipped through interstate commerce extinguishes upon delivery. *Republic Carloading & Distributing Co. v. Missouri Pac. R. Co.*, 302 F.2d 381, 386

(8th Cir.1962). Delivery is a question of federal law. *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 212–13, 51 S.Ct. 453, 454–55, 75 L.Ed. 983 (1931). Since " 'delivery' must mean delivery as required by the contract [of carriage]," (*i.e.*, the bill of lading and the tariffs), the intention of the parties defines its scope. *See Georgia, F. & A. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 195, 36 S.Ct. 541, 543, 60 L.Ed. 948 (1916).

We turn now to the meaning of delivery in this case. In the context of a motion for summary judgment, the interpretation of a contract (and, here, the meaning of delivery) may be a question of fact or law. *RCI Northeast Services Div. v. Boston Edison Co.*, 822 F.2d 199, 202 (1st Cir.1987). If reasonable persons cannot differ as to what the contract means, "either because the language is unambiguous" or the evidence about the parties' intent is "sufficiently one sided," the judge must decide the issue as one of law. *Boston Five Cents Sav. Bank v. Secretary of Dept. of Housing and Urban Development*, 768 F.2d 5, 8 (1st Cir.1985). Otherwise, the question is a factual one.

A "straight bill of lading," such as we have here, simply requires delivery of the goods to the consignee. *See Estherville Produce Co. v. Chicago, R.I. & P.R. Co.*, 57 F.2d 50, 53 (8th Cir.1932). Generally, the spotting of a shipment at the consignee's place of business constitutes delivery regardless of whether the consignee has accepted or rejected the goods. *Johnson & Dealaman, Inc. v. Wm. F. Hegarty, Inc.*, 224 A.2d 510, 513 (N.J.Super.Ct.App.Div. 1966); S. Sorkin, *Goods in Transit* § 7.02[1] at 7–11 (1987). And "[n]ormally unloading is not part of a delivery and is performed by the consignee." *Secretary of Agriculture v. United States*, 347 U.S. 645, 647, 74 S.Ct. 826, 828, 98 L.Ed. 1015 (1954). However, spotting a shipment is not *final* delivery if "anything remains to be done by the carrier in order to effectuate a delivery." *Keystone Motor Freight*

---

1. Section 2(b) is within the bounds of § 11707(e) of the Carmack Amendment under which "[a] carrier may not provide by rule, contract, or otherwise, a period of less than nine months for filing a claim against it...."

*Lines v. Brannon–Signaigo Cigar Co.,* 115 F.2d 736, 738 (5th Cir.1940); *Brockway Smith Co. v. Boston and Maine Corp.,* 497 F.Supp. 814, 818 (D.Mass.1980).

There is evidence in this case that something more remained to be done by the carrier to complete the delivery. We find that the reference "per Mrs. Dowling with c/ " in the bill of lading rendered ambiguous the carrier's contractual obligations. This reference alludes to the April 23 letter in which the consignor quoted a price for, among other things, *unloading.* Since the applicable tariffs explicitly provided that it was the *consignee's* duty to unload, and the consignor's duty only to *assist* in unloading upon being requested to do so, reasonable persons could have differed as to the intention of the parties at the time the bill of lading was issued. Since we are viewing all facts in the light most favorable to the plaintiff, we will assume, first, that the April 23 letter shifted to the carrier the duty to unload; and second, that the handwritten provision which incorporates that letter in the bill of lading overrides any conflicting provisions in the contract of carriage. *See* 3 *Corbin on Contracts* § 548 at 181–82 (1960). Accordingly, we assume *arguendo* that merely spotting the container at the consignee's did not constitute final delivery in this case.

If we take the shipment to be still in transit, (*i.e.,* no "final delivery" had yet occurred), then § 2(b) of the bill of lading would bar the suit unless it was brought within nine months after a reasonable time for delivery had passed. Thus, § 2(b) presents us with two questions. The first is, when delivery reasonably should have been made by the carrier. In *Chesapeake & O. Ry.,* 283 U.S. at 213, 51 S.Ct. at 455, the Court held:

> What constitutes a reasonable time depends upon the circumstances of the particular case. As applied to a case like this, it means such time as is necessary conveniently to transport and make delivery of the shipment in the ordinary course of business, in the light of the circumstances and conditions surrounding the transaction.

The second question is whether the consignee filed his claim within nine months from the date delivery should have been made—*not* from the time the consignee first discovered its right to file a damages claim. *See John B. Sanfilippo & Son, Inc. v. Consolidated Rail Corp.,* 659 F.Supp. 990, 995 (N.D.Ill.1987).

The facts here show that the machinery was shipped on May 17. If delivery (including unloading) reasonably should have been made sometime from May 24 through September 15 (a period of over three months), the claim (filed June 16) would still have been barred. The question then is whether 90 days or earlier was a commercially reasonable time for a carrier to complete a delivery by unloading the machinery.

The district court had sufficient evidence to conclude, as a matter of law, that delivery should have been made at least by September 15, 1985. According to the plaintiff's scenario, CF should have delivered on May 24, when the shipment was spotted. Intech requested that the driver who delivered the machinery also unload it, and even offered CF some special equipment with which to unload. Intech also refused to sign the receipt for the container because of the failure to unload. It was clear at this time that a dispute was in the making. Two or three days, a week, perhaps even a month, may have been a commercially reasonable time to either settle the dispute and complete delivery or decide delivery was not going to occur. We need not count the days, however, because it is clear that more than three months is too long. Accordingly, the claim, filed thirteen months after May 24 was untimely as a matter of law.

### A. Was Intech excused?

Intech urges this court to disallow CF's contractual defense for two reasons. First, Intech alleges that CF had actual knowledge of the damage to the machinery. At issue here is the relevance of the March 16, 1986 discovery that the machinery was damaged. Second, it claims that CF's conduct in refusing to unload misled Intech

into believing a timely written claim was unnecessary.

We must keep in mind that the main purpose of § 2(b) of the bill of lading is to facilitate a prompt investigation by the carrier of a claim against it. *Blish Milling Co.*, 241 U.S. at 196, 36 S.Ct. at 544. One court has suggested that, if the carrier had actual knowledge of all the facts surrounding the claim, the filing of a *formal* notice "could not have accomplished anything more," and is, therefore, excused. *Hopper Paper Co. v. Baltimore O.R. Co.*, 178 F.2d 179 (7th Cir.1949), *cert. denied*, 339 U.S. 943, 70 S.Ct. 797, 94 L.Ed. 1359 (1950).[2]

Most courts, however, have declined to find an excuse for formal notice on the basis of actual knowledge alone. The courts have focused instead on the carrier's conduct as the basis for applying the theory of waiver or estoppel. *See Wisconsin Packing Co., Inc. v. Indiana Refrigerator Lines, Inc.*, 618 F.2d 441, 446-47 (7th Cir.) (en banc), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980) (without deciding whether actual knowledge might be sufficient, the court cursorily stated in dicta "defendant's conduct would seem sufficient to invoke the doctrine of estoppel"); *Perini–North River Associates v. Chesapeake & O. Ry. Co.*, 562 F.2d 269, 273 (3d Cir.1977) (the carrier's departure from its claims procedure, in addition to having told the shipper a formal claim was unnecessary, misled the shipper); *Union Carbide Corp. v. Consolidated Rail Corp.*, 517 F.Supp. 1094, 1097–98 (N.D.Ill.1981) (in addition to having actual knowledge, the carrier falsely told the shipper there had been no damage to the goods while in transit and the carrier's conduct prevented the shipper from filing a timely claim); *Hicks v. BHY Trucking, Inc.*, 665 P.2d 253, 254–55 (Nev.1983) (carrier waived or was estopped from asserting the defense since the shipper would have filed a formal claim but

for the carrier's unfulfilled promises to investigate the damage).

CF responds that § 2(b) of the bill of lading is mandatory and not subject to waiver or estoppel. *See B.A. Walterman v. Pennsylvania R. Co.*, 295 F.2d 627 (6th Cir.1961); *see also Blish Milling Co.*, 241 U.S. at 197, 36 S.Ct. at 544 (in dictum); *Chesapeake & O. Ry. Co.*, 283 U.S. at 222, 51 S.Ct. at 458 (leaving the issue open). The *Walterman* court reasoned that an estoppel or waiver theory would violate the Interstate Commerce Act since a carrier could discriminate by paying untimely or informal claims of preferred shippers while disallowing those of others similarly situated.

■ Assuming, without deciding, that actual knowledge of damage on the part of the carrier could be enough to justify an insufficient or untimely claim, the record on summary judgment is barren of any evidence that CF acquired actual knowledge of damage to the machine prior to the time in which the damage was actually discovered on March 16, 1986. Furthermore, CF had no knowledge beyond the mere fact of the damage. Were we to adopt the extreme position of *Hopper Paper*, we would need to find that CF knew of the damage, its causes, circumstances and extent. *See Hopper Paper*, 179 F.2d at 182 ("[I]t is undisputed that defendant and its agents were fully aware and cognizant of the existence of all the facts concerning the wreck and destruction of the carload of paper."). *Cf. Wisconsin Packing Co. v. Indiana Refrigerator Lines*, 618 F.2d 441, 448 n. 7 (7th Cir.1980) (*Hopper* distinguishable where carriers do not have "the kind of actual knowledge available in *Hopper*"). We therefore find that the issue of excuse based on full awareness by the defendants is not present in this case.

■ Intech avers that CF "deliberately delayed delivery to put Intech, Inc. in de-

---

**2.** The rule in *Hopper Paper* has been the issue of debate within the Seventh Circuit, *see Wisconsin Packing Co. v. Indiana Refrigerator Lines*, 604 F.2d 1022 (1979), *vacated after reh'g en banc* in 618 F.2d 441 (1980) (Sprecher, Cir. J., dissenting at 448), and the validity of its literal holding is questionable. *See id.* 618 F.2d at 448: "Since

there was more than actual notice in this case, to overrule *Hopper* would be inappropriate, particularly insofar as that case helps illuminate the role actual notice can play in an evaluation of the overall situation." As discussed below, we need not address the validity of the *Hopper Paper* rule.

fault." Such a conclusory allegation, without specific facts to support it, is insufficient to oppose a summary judgment motion. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Nonetheless, Intech argues that the unloading dispute induced it to file an untimely claim. That argument, however, shows no "genuine" issue of material fact. Intech has not alleged any facts which could have evidenced a genuine reliance, such as the carrier's breach of a promise to investigate and process the claim, *Hicks,* 665 P.2d at 254–55, or the carrier's misleading representation that a written claim was unnecessary, *Perini–North River Associates,* 562 F.2d at 273, or that the carrier's conduct had obscured the discovery of any damage, *Union Carbide Corp.,* 517 F.Supp. at 1097–98.

To the contrary, the container remained at Intech's yard for about six months, during which time Intech could have discovered the damage. CF's conduct did not prevent Intech from examining the machine at any time before March 1986. Without deciding whether a theory of waiver or estoppel applies to a § 2(b) defense, we hold there is no evidentiary foundation in this case to create a triable issue of fact since the plaintiff had sufficient time to inspect the container, discover any damage, and file a claim. *Pathway Bellows, Inc. v. Blanchette,* 630 F.2d 900, 905 n. 10 (2d Cir.1980), *cert. denied,* 450 U.S. 915, 101 S.Ct. 1357, 67 L.Ed.2d 340 (1981); *Insurance Co. of North America v. Newtowne Mfg. Co.,* 187 F.2d 675, 680 (1st Cir.1951); *Calpro Co. v. Consol. Engineering Co. of Georgia,* 502 F.Supp. 707, 711, 715 (N.D. Ga.1980).[3]

### B. *Form over Substance?*

■ In an attempt to bypass the proscription of § 2(b), Intech argues that its complaint presented a *state* law breach of contract claim for failure to unload. We disagree. The theory of the suit concerned the carrier's breach of an obligation under the contract of carriage to deliver a shipment in good condition. Intech only sought to recover for damages occurring while the machine was in transit. As in *Blish Milling Co.,* 241 U.S. at 197, the substance of the action is "nothing more than an action for damages against the delivering carrier." Even if Intech had sought to recover damages incidental to CF's refusal to unload, the Carmack Amendment provides the exclusive remedy for such a suit. *See, e.g., Air Products and Chemicals, Inc. v. Illinois Central Gulf R. Co.,* 721 F.2d 483, 485 (5th Cir.1983), *cert. denied,* 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984).

### III. *Conclusion*

The decision of the district court granting CF's motion for summary judgment is *affirmed.*

---

**3.** Even if CF's actions prevented Intech from discovering the damage, Intech's claim is still barred by section 2(b) of the bill of lading. The relevant language states "in case of failure to make delivery," a claim must be filed "within nine months after a reasonable time for delivery has elapsed." According to Intech, the shipment was never "delivered," as that term is defined by the contract. For example, in its reply brief, Intech states that its "position consistently before the district court and in its Brief before this Court has been that CF had an obligation under the controlling law to unload the shipment in order to perfect delivery." Intech cannot argue that CF's actions prevented it from filing a claim for nondelivery, because Intech had knowledge of the nondelivery from the first day that CF refused to unload the shipment. Since we have ruled that as a matter of law nearly four months is longer than a "reasonable time," Intech's claim is barred by the terms of the contract.

It is true that Intech characterizes this suit as a claim for damage to the shipment, rather than as a claim for nondelivery. However, the applicable time limitation under the contract is for nondelivery and a claim for nondelivery would have subsumed the value of the shipment. We fail to see how Intech's characterization of its claim can extend the time period within which it may file that claim under section 2(b).